## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AISHAN BASHAR, | ) | CASE NO. 4:07CV3124 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| vs. | ) | AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial, initially and on reconsideration, of the Plaintiff's supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381, *et seq.*  The Court has carefully considered the record (Filing No. 11) and the parties' briefs (Filing Nos. 15, 18).

### PROCEDURAL BACKGROUND

The Plaintiff, Aishan Bashar, filed her initial application for SSI benefits on July 10, 2003.  (Tr. 71-74.)  The claim was denied initially (Tr. 35-36) and on reconsideration (Tr. 37-38).  An administrative hearing was held before  Administrative Law Judge ("ALJ") Jan E. Dutton on May 5, 2005.  (Tr. 405.)  Additional evidence was later submitted.  (Tr. 365-401.)  On March 29, 2006, the ALJ issued a decision finding that Bashar was not "disabled" within the meaning of the Act and therefore is not eligible for SSI benefits.  (Tr. 17-33.)  On March 8, 2007, the Appeals Council denied Bashar's request for review.  (Tr. 7-9.)  Bashar now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Bashar argues that the ALJ's decision was incorrect because the ALJ erred in failing to: 1) find Bashar's testimony credible; 2) give significant weight to medical opinions that support Bashar's position; and 3) consider third-party statements.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Bashar asserts that her disabiity onset date is July 1, 2003, and that she is unable to work due to depression, post-traumatic stress disorder and back pain.  (Tr. 19, 84, 412.)

### DOCUMENTARY EVIDENCE BEFORE THE ALJ

On October 23, 2002, Bashar was treated at the Lincoln Centre Clinic, P.C., by Gary M. Kilian, D.O., for the purpose of an evaluation prior to obtaining a Department of Motor Vehicle learning permit.  Dr. Kilian noted that Bashar's psychiatric symptoms had resolved to the point that her psychiatric medications had been discontinued.  However, the doctor noted that Bashar had not addressed her anemia.  On examination, Bashar was alert, oriented, and seemed appropriate.  Her gait was smooth and regular.  (Tr. 142.)  Dr. Kilian's impression was improved depression, post-traumatic stress disorder and persistent anemia.  (Tr. 142.)

On March 3, 2003, a lumbar spine radiology report written by Brian D. Foote, M.D., after Bashar sustained a fall, revealed a normal spine with normal vertebral alignment, normal height of the vertebral bodies and no evidence of spondylolysis.  (Tr. 145.)

2

From July 9, 2002, through June 24, 2003, Bashar was treated at Family Psychiatric Associates of Lincoln by Pratap V. Pothuloori, M.D. (Tr. 155-62.)   The depressants Remeron and Zoloft were prescribed and tolerated well without side effects.  (Tr. 160.) Dr. Pothuloori diagnosed Bashar with major depressive disorder.  However, on June 23, 2003, he indicated that she was goal-oriented and had no flight of ideas, loosening of association or paranoia.  He nevertheless noted a depressed affect.  (Tr. 158.)  At that time, it was noted that Bashar discontinued her medication one month prior to becoming pregnant.  (Tr. 156.)  Bashar stated that she had been looking for a job for a long time. She complained of pain throughout her body and it was noted that she continued to struggle with anxiety and depression.  Bashar denied any psychotic symptoms.  (Tr. 156.) Bashar was assigned a GAF of 60.  (Tr. 158.)

On July 1, 2003, Klaus Hartmann, M.D., of the Community Mental Health Center of Lancaster County, Nebraska, wrote that he did not recommend that Bashar work for the foreseeable future.  (Tr. 163.)  On that date, Dr. Hartmann also completed a discharge summary for Bashar, who had been admitted to the Lancaster County Crisis Center.  (Tr. 165.)  He noted that Bashar was not pervasively depressed but was worried and troubled by her financial situation and overwhelmed by the demand of having to go to work.  He characterized Bashar's difficulties as more social than psychiatric in nature.  His diagnosis was adjustment disorder with disturbance of mood.  (Tr. 165.)

On July 22, 2003, Bashar was examined by Don Rice, M.D., due to her complaints of anger, depression and insomnia.  Dr. Rice noted that Bashar "doesn't feel that she has to work or wants to work." (Tr. 198.)  He diagnosed Bashar with situational depression with resultant insomnia.  (Tr. 198.)  On September 25, 2003, Dr. Rice again examined Bashar

3

and noted that she had asked him to certify that she was unable to learn English for the Immigration and Naturalization Service test.  (Tr. 193.)  Dr. Rice stated, however, that Bashar did not meet the necessary criteria and was mentally and physically able to learn English.  (Tr. 193.)  He noted that Bashar had experienced some depression, but he also noted that she had been non-compliant with his therapy.  Specifically, he noted that she refused to take Prozac that had been given to her.  (Tr. 193.)  He further noted that Bashar was not hearing voices and did not feel any of the Axis I diagnoses of major depression. (Tr. 193.)  When Dr. Rice told Bashar that she did not meet the Axis I criteria of major depression, she disagreed with him.  (Tr. 193.)

On October 22, 2003, Bashar was consultatively examined by Daniel L. Ullman, Ph.D., M.S., who noted that Bashar is Kurdish and originally came from Iraq.   An interpreter was present for the examination, as Bashar speaks very little English.  Bashar's son was also present to provide information.  Bashar measured five feet and five inches tall and weighed 130 pounds.  (Tr. 168.)  She was eight months pregnant.  Bashar had been in the United States for five years.  Prior to that, she and her family had been in a Syrian refugee camp for seven years after fleeing from Iraq.  Bashar has no educational background and has never worked outside the home.  She does not understand U.S. currency.  Prior to the onset of her depression, she cooked and did household chores for her family which then included six children.  Bashar stated that she could no longer cook, had trouble sleeping, heard voices when trying to go to sleep and endured crying spells. (Tr. 169.)  She described her difficulties in some detail.  She indicated that her psychotropic drugs helped her condition in the past, but she had to discontinue the medications due to her pregnancy. In 2003, Bashar had suicidal thoughts, and on at least

4

a couple of occasions she went to the railroad tracks intending to commit suicide.  A mental health therapist, Katherine Zupancic, was visiting Bashar at home.  Bashar's physical complaints were back pain and headaches.   Mental functioning examination showed that Bashar was alert, but that she had problems sustaining attention and concentration.  (Tr. 170.) Dr. Ullman stated that Bashar had limited her daily activities due to severe depression.   Bashar also experienced difficulties in social functioning with recurrent episodes of deterioration under distress.  Dr. Ullman stated that Bashar was unable to understand and remember even short instructions and would not be able to relate appropriately to coworkers or supervisors.  (Tr. 171.)  He added that she cannot manage her own funds and needed a payee.  He diagnosed her with major depressive disorder of a severe type and assigned a GAF of 40.  (Tr. 172.)

A lumbar spine radiology study dated January 20, 2004, showed a normal spine with partial sacralization of L5.  (Tr. 204.)  On the same date, a study of the right knee was normal.  (Tr. 205.)  Bashar participated in physical therapy six times in March 2004, and she reported that she received no benefit from the therapy.  (Tr. 223-29.)

On May 13, 2004, Bashar was treated at Prairie Psychiatric Associates, P.C.  It was noted that she was troubled by the demand that she attend language classes.  She also worried about putting her youngest child in day care.  Stress management was discussed. (Tr. 369.)

On May 17, 2004, Liane Donovan, M.D. examined Bashar.  Dr. Donovan stated that an April 1, 2004, MRI of Bashar's back showed a small central disc bulging and some facet arthrosis eccentric to the right.  It was noted that her pain followed an L4 distribution and an epidural pain relief shot was discussed.  (Tr. 259.)

5

On June 30, 2004, Bashar was diagnosed with depression and fibromyalgia by Patricia Spitzer, PA-C, who appears to be affiliated with Dr. Rice.  (Tr. 232).  Bashar's social difficulties were discussed.  Bashar was told to increase her fluids, and she was shown exercises to increase her oxygen level and increase her flexibility and muscle relaxation.  Getting out socially was also recommended.  (Tr. 232.)

On July 18, 2004, Bashar went to the emergency room at Bryan Lincoln General Hospital Medical Center-West with complaints of back, knee and head pain that had lasted a few days. (Tr. 248.)  The examination was normal.  She moved well and had full range of motion of the spine and a normal neurological examination.  She also had normal balance and gait.  (Tr. 251.)

On October 12, 2004, Bashar was examined by Daniel P. Noble, M.D., of the LOC Spine Center.  (Tr. 341.)  Dr. Noble stated that the examination was normal but for non-organic signs.  He noted that there did not appear to be any significant spinal pathology that could explain Bashar's ongoing symptoms.  (Tr. 341.)  An MRI was noted to be "really quite good" and there was no evidence of neural foraminal or central canal compromise. Disc heights were well maintained.  Dr. Noble suggested that Bashar visit with Dr. Paulus about reinstituting medications to help with her depression.  (Tr. 341.)  Importantly, Dr. Noble stated:

> I have not recommended she restrict herself with respect to any day-to-day activities.  I think the more active she can be, the better off she will be.  She does not have any further need for additional diagnostic evaluation or active treatment for her spine from my standpoint.

(Tr. 341.)

On November 1, 2004, Bashar again went to the emergency room of Bryan Lincoln General Hospital Medical Center-West with complaints of back and bilateral leg pain. She had a normal range of motion. (Tr. 261.) Radiological studies of the right knee were negative. (Tr. 263-64.) Bashar was diagnosed with acute exacerbation of chronic low back pain and lumbar radiculopathy. (Tr. 264.) She had a contusion to the right knee and back strain. (Tr. 265.)

From November 12, 2004, until March 14, 2005, Bashar was treated at the People's Health Center. (Tr. 345-50.) Records indicate that Bashar had internal derangement of the right knee and back pain. (Tr. 350.) On January 14, 2005, Bashar was given a pain injection to her right knee at Nebraska Orthopaedic and Sports Medicine, P.C. (Tr. 327.) The listed impression was right knee arthrosis. (Tr. 327.) A December 21, 2004, MRI indicated questionable mild chondromalacia over the posterolateral aspect of the medial femoral condyle. (Tr. 328.)

On February 8, 2005, Bashar was treated at Prairie Psychiatric Associates, P.C. Notes indicate that although Bashar still had some problems with depression her condition was somewhat better with Trazodone. Her sleep also had improved. (Tr. 337.) Bashar mentioned that she had witnessed many deaths in Iraq and that she witnessed her cousin being killed. (Tr. 339.)

An April 12, 2005, letter from a registered nurse with Plaza West Psychiatrists indicated that Bashar had shown some improvement with her depression with anti-depressant therapy. It was noted that sleep was still a problem, and Bashar continued to experience difficulty managing her affairs and daily activities. (Tr. 340.)

7

In a letter dated April 12, 2005, Bashar's physical therapist stated that she had problems with her knees and walked slowly.  (Tr. 342.)  However, Bashar was able to do all of her housework and daily "cares" independently, as well as care for her seven children.  The therapist stated that her cadence might be due to general fatigue, noting that Bashar often mentioned that she was tired from caring for seven children.  (Tr. 342.)

On May 13, 2005, a prescription form from the People's Health Center indicated that Bashar was unable to work due to back and knee degenerative arthritis.  (Tr. 358.)

From April 12, 2005, through May 31, 2005, Bashar was seen at the office of Katherine Zupancic Consulting, P.C., for major depressive disorder, recurrent and moderate.  (Tr. 366, 372-87.)  In a letter requested by Bashar's attorney for purposes of her social security case, it was stated that Bashar had distinct symptoms of depression, impaired sleep, generalized anxiety, extreme anxiety about family and neighborhood issues, and social anxiety.  (Tr. 366-67.)  Bashar experienced moderate to marked restrictions in her activities of daily living, even though it was noted that she was responsible for running her household and raising seven children. (Tr. 367.) Therapist Teri Langan Dee, MA, LMHP, opined that Bashar would have difficulty performing competitive, full-time employment due to: a fair to poor ability in making occupational, performance, and personal/social adjustments; social anxiety that might result in difficulty relating to co-workers, supervisors and the public; possible hesitancy to ask for assistance; difficulty concentrating and maintaining focus; difficulty carrying out complex and detailed job instructions; possible difficulty behaving socially and emotionally appropriate; possible difficulty dealing with pressure and stress; difficulty adjusting to changes to her daily routine; and difficulty traveling to unfamiliar places or using public transportation.  It was

8

noted that therapeutic progress has been limited, and that Bashar has interacted appropriately with her therapist in her home environment.  (Tr. 367.)

An August 1, 2005, an MRI of Bashar's lumbar spine showed a lipoma of the filium terminale with an associated tethered cord.  There was no disc herniation, central canal stenosis, or neural foraminal stenosis.  (Tr. 388.)

On September 12, 2005, Geoffrey M. McCullen, M.D. examined Bashar upon referral from Dr. Paulus.  Bashar described her chronic pain beginning with her fall four or five years previously and worsening after a motor vehicle accident two or three years before her examination.  Bashar complained of pain in the right buttock, posterior thigh, calf, and into her right foot.  Neurologically, Bashar had normal muscle mass, good strength and equal reflexes.  Her range of motion was satisfactory and without pain, and she was not in acute distress.  (Tr. 400.)  Bashar was assessed with right lower extremity radicular discomfort, no objective radiculopathy, and evidence of tethered cord on her MRI scan.  (Tr. 401.)

On October 17, 2005, at Bryan Lincoln General Hospital Medical Center Bashar underwent an L4, L5, S1 decompressive laminectomy with intradural exploration and suctioning of the terminal lipoma using scope and somatosensory-evoked potentials. Bashar was discharged on October 20, 2005.  The discharge summary indicates that Bashar tolerated the procedure well and felt significantly better as a result of the procedure.  (Tr. 389.)

A followup appointment on October 24, 2005, showed that Bashar was doing quite well and had full strength of her lower extremities.  The stabbing right side pain had

9

improved.  Bashar continued to have some low back pain, but Bashar admitted that she had been overdoing her activity.  (Tr. 397.)

On November 16, 2005, Bashar was seen for additional followup by Christopher S. Kent, M.D., of Neurological and Spinal Surgery, LLC.  Bashar reported that her burning leg pain was completely gone.  While Bashar complained of some back pain, she had been bending over and picking up after people as early as two weeks after her surgery.  Dr. Kent told her to cut back a bit so that she would heal.   Bashar was to return for followup in one month.  (Tr. 395.)

### ADMINISTRATIVE HEARING

### *Claimant's Testimony*

Bashar testified through an interpreter at an administrative hearing held before Administrative Law Judge ("ALJ") Jan E. Dutton on May 5, 2005.  (Tr. 405, 414-28.)  Bashar was born on January 1, 1965.  She never attended school, never had any job training, and had always been a housewife.  (Tr. 414-15.)  Bashar is originally from Iraq and at the time of the hearing had been in the United States for seven years.  She testified that she had seven children, with the youngest being one year and five months old.  Her husband was also awaiting a disability decision based on alleged back and leg pain.  (Tr. 415).  She said she does household chores as she is able, and otherwise her children help her.  She has not attended English classes.  (Tr. 416.)  She ceased taking her anti-depressant medication during her latest pregnancy.  (Tr. 417.)  She complained of back and right leg pain, which is relieved by medication for up to three hours at a time.  Sitting for one-half an hour or standing for ten minutes cause pain.  (Tr. 418-19.)  She testified that she has to alternate sitting and standing, and because of her knee pain it is most

10

comfortable for her to sit on the floor.  Bashar had one epidural shot in her back, one in her shoulder, and one in her right knee, and she also went to physical therapy.  She testified that neither the shots nor therapy helped her pain.  (Tr. 419-20.)

Bashar testified that she takes an anti-depressant three times daily.  The medication helps her ability to do her housework, care for her children, and sleep.  (Tr. 422.)  Bashar testified that she continues to hear voices at night and that she is confused.  (Tr. 423.)  She testified that she receives only temporary relief lasting one or two hours from her anti-depressant.  (Tr. 425.)  Generally, her testimony is that she has not experienced relief from her medication.  (Tr. 425-26.)  She testified that she experiences debilitating headaches three times each week that last up to three hours.   (Tr. 427-28.)

Bashar testified that if she could, she would work.  Her children range in age from one year and five months to age seventeen, and no one else is available to care for them. (Tr. 426.)  The older children help with child care, housework and cooking.  (Tr. 426-27.) Bashar testified that she is familiar with American paper bills, but not with coins.  (Tr. 427.)

### Vocational Expert

Steven Kuhn, M.A., CRC, a vocational expert ("VE"), testified at the hearing.[1]  (Tr. 428-34.)  The ALJ posed a hypothetical question with the following parameters relating to work: no physical restrictions; no involvement of reading or writing; can be taught by demonstration; limited to routine, repetitive work with ordinary supervision; no changes, goal setting, driving or use of public transportation to unfamiliar places; no more than occasional interaction with coworkers or the public (limited due to language skills).  (Tr.

---

[1]Mr. Kuhn's curriculum vitae is in the record.  (Tr. 58-59.)

430-31.)  In response to this question, the vocational expert stated that a person with this residual functional capacity ("RFC") could perform the light jobs of hand packer, vehicle washer, laundry worker, and assembler.  All of these jobs exist in significant numbers in the national and local economies.  (Tr. 431-32.)

The VE testified that if Bashar's testimony is viewed as credible, she would not be able to perform any jobs, even of a light or sedentary nature.  (Tr. 433-34.)  Specifically, the VE referred to Bashar's following complaints: sitting for thirty minutes, standing for ten minutes, then sitting again; having to take medication; back, leg and right hip pain; confusion; and headaches.  (Tr. 434.)

## EVIDENCE SUBMITTED POST-HEARING

Additional evidence was submitted to the appeals council.  This evidence consists of a report of a June 1, 2006, spinal MRI and a July 23, 2006, letter from Dr. Paulus.  The MRI revealed: fluid collection in the soft tissues dorsal to the spinal canal; a normal spinal curvature; no edema or compression of the vertebral bodies; unremarkable distal thoracic cord and conus; and unremarkable discs with no evidence of significant height loss and no enhancing mass.  (Tr. 404.)  In his letter, Dr. Paulus opined that the combination of back, knee and psychiatric disorders do not allow Bashar to work at any type of gainful employment.  (Tr. 403.)

## THE ALJ'S DECISION

The ALJ found that Bashar was not "disabled."  (Tr. 20.)  The ALJ framed the issues as: 1) whether Bashar is entitled to SSI benefits under the Act, as amended; and 2) whether Bashar is "disabled."  (Tr. 19.)

12

The ALJ followed the sequential evaluation process set out in 20 C.F.R. § 416.920 to determine whether Bashar was disabled, considering any current substantial gainful work activity, the severity of any medically determinable impairment(s), and Bashar's residual functional capacity with regard to her ability to perform past relevant work or other work that exists in the regional and national economies.  (Tr. 20.)

Following this analysis, the ALJ found that Bashar is not disabled.  (Tr. 20, 32.) Specifically, at step one the ALJ found that since July 1, 2003, the alleged onset date of disability, Bashar has not performed any substantial gainful work activity. (Tr. 20.) At step two, the ALJ found that Bashar has the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations: low back pain; and depression/rule out post-traumatic stress disorder.  (Tr. 26.)  At step three, the ALJ found that Bashar's medically determinable impairments, either singly or collectively, do not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings."  (Tr. 27.)  At step four, the ALJ determined that, despite Bashar's medically determinable impairments, her RFC is characterized by the absence of any physical restrictions, and Bashar has no past relevant work  (Tr. 30.)  Finally, at step five, the ALJ considered in particular Bashar's inability to speak English, her need to have a job that does not require reading or writing and that can be taught by demonstration; the need for an unskilled job with a vocational preparation time from one to thirty days that is routine and repetitive in nature with ordinary supervision; the required absence of job changes or set goals, or transportation to unfamiliar place; and the involvement of only occasional social interaction with coworkers or the public.  (Tr. 30.)  The ALJ found that Bashar, despite her functional limitations, has the ability to perform the

unskilled, light and sedentary occupations described by the VE: hand packer; vehicle washer; laundry worker; and assembler.  (Tr. 32.)  In so deciding, the ALJ weighed Bashar's testimony, finding the testimony "not credible."  (Tr. 28, 29, 32.)  The ALJ also carefully considered the medical records submitted by treating and consultative physicians and mental health professionals.  (Tr. 20-26.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo.  Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994).  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that she has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

### SEQUENTIAL EVALUATION

In determining disability for SSI purposes, the Act follows a sequential evaluation process. 20 C.F.R. § 416.920. In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

In this case, the ALJ completed all five steps in the evaluation process, concluding

15

in the final step that Bashar, despite her functional limitations, has the ability to perform the unskilled light and sedentary occupations described by the VE: hand packer; vehicle washer; laundry worker; and assembler.  (Tr. 32.)

The Court agrees with the Defendant that the issues in this case are whether the ALJ: 1) performed a proper credibility determination with respect to Bashar's testimony and the medical evidence; and 2) was correct in determining Bashar's RFC.  (Filing No. 18, at 11-16.)

## PLAINTIFF'S CREDIBILITY

Bashar argues that the ALJ did not properly apply the correct standard in evaluating her subjective complaints of pain.  Relevant are 20 C.F.R. § 416.920(e) and Social Security Ruling 96-7p.  The underlying issue is the severity of the pain.  *Black v. Apfel,* 143 F.3d 383, 386-87 (8th Cir. 1998).  The ALJ is allowed to determine the "authenticity of a claimant's subjective pain complaints."  *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)).  An "'ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.'"  *Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue as whether the record as a whole reflected inconsistencies that discredited the plaintiff's complaints of pain) (quoting *Gray v. Apfel,* 192 F.3d 799, 803 (8th Cir.1999)).

The *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1986), standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results
> from a medically determinable physical or mental impairment, direct medical

16

evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication;
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000). This duty is fulfilled when an ALJ acknowledges the *Polaski* factors and clearly examines the factors before discounting the claimant's testimony. An ALJ is "not required to discuss methodically each *Polaski* consideration." *Id.* at 972.

Regulations provide that the ALJ must consider all symptoms, "including pain, and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence," defined as "medical signs and laboratory findings." 20 C.F.R. § 416.929. Medical "signs" are defined as:

anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b).

"Laboratory findings" are defined as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 416.928(c).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record. Ruling 96-7p provides that the ALJ must consider such factors as:

* The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

* The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in . . . 20 CFR 416.913(e). . . .  However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine

18

whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

* The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996). [2]

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Bashar's case, the record illustrates that the ALJ performed a thorough *Polaski* analysis in determining the credibility of Bashar's subjective complaints regarding physical pain and her mental condition. The ALJ considered: the lack of doctor's restrictions in the record, and medical advice that Bashar become physically active; numerous unremarkable medical examinations; Bashar's apparent rapid improvement following surgery and her ability to perform all of her household duties following physical therapy; Bashar's noncompliance with treatment; and Bashar's apparent lack of motivation to work.[3] (Tr. 27-29.)

---

[2]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."

[3]A claimant's apparent lack of motivation to work may be considered not singly, but rather together with other factors. *Ramirez v. Barnhart,* 292 F.3d 576, 582 n.4 (8th Cir. 2002).

The ALJ summarized Bashar's complaints relating to her pain and its effect on her daily activities reflected and considered third-party statements that supported her claims. (Tr. 27-28, 30.)  The ALJ noted discrepancies between Bashar's symptoms as reported by Bashar and the third-party statements and the medical evidence.  (Tr. 28-30.)

In summary, the ALJ thoroughly considered Bashar's subjective pain complaints, the reports of her primary treating physicians, efforts with medication, reports of agency physicians, Bashar's own statements, and third-party statements.  The ALJ correctly engaged in the *Polaski* analysis.  The ALJ followed the appropriate framework set out in § 416.929, and the ALJ acknowledged the *Polaski* standard as well as applicable regulations and SSR 96-7p.  The ALJ's conclusion that Bashar has the RFC necessary to perform the jobs listed by the VE is well-founded, and followed an appropriate express credibility determination regarding Bashar's assertion of subjective complaints.  The ALJ's credibility decisions are well-supported and based on a thorough analysis of treating and consultative medical reports.

Therefore, the ALJ appropriately determined credibility issues with respect to Bashar's subjective complaints of pain.

### RESIDUAL FUNCTIONAL CAPACITY ("RFC")

RFC is defined as what Bashar "can still do despite . . . limitations."  20 C.F.R. § 416.945(a)(1).  The ALJ must determine RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of relevant limitations. *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000).  Before determining RFC, an ALJ first must evaluate the claimant's

credibility.  In this case, the ALJ found Bashar's testimony not credible.  In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; the duration, frequency and intensity of pain; the dosage and effectiveness of medication; the precipitating and aggravating factors; and functional restrictions.  *See Polaski,* 739 F.2d at 1322; *see also* § 416.929.  Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.  *Polaski,* 739 F.2d at 1322.  A lack of work history may indicate a lack of motivation to work rather than a lack of ability.  *See Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir.1993) (stating that a claimant's credibility is diminished by a poor work history). Finally, the credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide.  *Pearsall v. Massanari,* 274 F.3d at 1218 (8th Cir. 2001).

In this case, the ALJ followed the appropriate analysis required by *Polaski* and § 416.920.  The ALJ summarized Bashar's allegations of pain and exhaustively described her daily activities according to the testimony and documentary evidence. (Tr. 20-30.)  The ALJ found that Bashar's testimony was not credible.  (Tr. 28-29, 32.)  The ALJ specifically considered, in addition to Bashar's testimony, documentary evidence including reports of treating and consultative physicians and the testimony of a VE.  (Tr. 20-26, 29-32.)  In reviewing the record, this Court specifically notes the inconsistencies between Bashar's assessment of her condition and the medical evidence and the common thread of Bashar's difficulties adjusting socially to her "new" environment.

21

**OPINION OF BASHAR'S TREATING PHYSICIANS**

Also, an ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate.  *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).  "The [social security] regulations provide that a treating physician's opinion  . . .  will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir.2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered an opinion inconsistent with other evidence as a whole.  *Id.* at 1013; *Holmstrom,* 270 F.3d at 720.  "The ALJ's function is to resolve conflicts among 'the various treating and examining physicians.'"  *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v. Shalala,* 52 F.3d 784, 785, 787 (8th Cir. 1985)).  Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give "good reasons" for that weighting.  *Holmstrom,* 270 F.3d at 720*; Prosch,* 201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2), analogous to 20 C.F.R. 416.927(d)(2) in the SSI context).

The ALJ considered the medical opinions of Drs. Paulus and Hartmann as well as therapists Teri Langan Dee and Dr. Carmer, consultative psychologist Ullman, and nurse Lisa Young.  (Tr. 29.)  While the ALJ did not specifically discuss the opinions of Dr. Hartmann and nurse Young, it is clear from the discussion that those opinions were discounted, along with the medical opinions specifically discussed.  (Tr. 29-30.)  The ALJ

22

discounted the opinion of Dr. Paulus as inconsistent with the record as a whole.  The Court notes that his opinion is clearly inconsistent not only with others' opinions but also medical evidence in Dr. Paulus's own records.

This Court has carefully reviewed the record and agrees with the ALJ's summary of the medical evidence.  The ALJ's conclusion that opinions were inconsistent with evidence in the record as a whole is supported by substantial evidence.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 22nd day of January, 2008.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge